IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 28, 2009

**STATE OF TENNESSEE v. KIM GESELBRACHT**

**Appeal from the Criminal Court for Rhea County**
**No. 16982     Thomas W. Graham, Judge**

---

**No. E2009-00290-CCA-R3-CD - Filed September 24, 2009**

---

On January 22, 2009, the Rhea County Criminal Court dismissed two counts of driving under the influence ("DUI") against the defendant, Kim Geselbracht. The trial court determined that a law enforcement officer's ignoring the defendant's repeated requests for an independent blood test for blood alcohol content ("BAC") denied the defendant his constitutional and statutory rights. The State appeals, arguing that the trial court erred by dismissing the charges. Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; J. Michael Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellant, State of Tennessee.

Carol Ann Barron, Dayton, Tennessee, for the appellee, Kim Geselbracht.

**OPINION**

On August 3, 2007, the defendant was arrested for DUI. In April 2008, a Rhea County grand jury charged the defendant with two counts of DUI. *See* T.C.A. § 55-10-401 (2004). On August 6, 2008, defense counsel filed several motions to suppress evidence. These motions challenged the initial investigatory stop of the defendant and the test results from the Intoximeter EC/IR II ("breathalyser"), citing several deficiencies in the test administration and the equipment used in the BAC testing. After holding a motions hearing on December 5, 2008, the trial court dismissed the charges based on its determination that the defendant was denied due process by a Rhea County law enforcement officer's refusing to permit him an independent BAC analysis. The State filed a timely notice of appeal.

At the motions hearing on December 5, 2008, defense counsel argued that law enforcement officers refused the defendant an opportunity to obtain an independent blood test for BAC pursuant to Code section 55-10-410(e). Counsel argued that, because the breathalyser malfunctioned, the defendant "wanted the right to be able to have his own testing done." Defense counsel argued that the refusal to allow the independent test was a violation of the defendant's right to due process.

Deputy Zack Davis of the Rhea County Sheriff's Department testified that he observed a Corvette "cross[] the fog line three times" for intervals of three to five seconds. Deputy Davis activated his blue lights, and the Corvette stopped in a parking lot. Deputy Davis noted that the vehicle traveled "for a little while on the shoulder of the road" before completely stopping. Upon speaking with the defendant, who was driving the vehicle, Deputy Davis noticed a faint smell of alcohol coming from the vehicle. Deputy Davis testified that after the defendant admitted drinking three or four beers at Paradise Bar, he asked the defendant to exit the vehicle. Deputy Davis said that the defendant swayed while standing and failed the horizontal gaze nystagmus, one-leg stand, and walk-and-turn tests. Based upon his observations, Deputy Davis arrested the defendant for DUI at approximately 11:38 p.m. When asked whether the defendant requested an independent blood test, Deputy Davis responded, "No, not that I recall." At the Rhea County Jail, Deputy Davis turned the defendant over to Sergeant Jake Miller.

Sergeant Miller testified that at the time of the hearing he had worked at the Rhea County Jail for one year and eight months and that he had attended classes and attained certification for use of the breathalyser. He estimated that he had operated the machine more than 25 times. He testified that he observed the defendant for 20 minutes preceding his breathalyser test and that the machine mandated a timed 20-minute period before allowing a defendant to blow into the machine. Sergeant Miller stated that the defendant did not smoke, vomit, or introduce foreign substances into his mouth during that time period. He testified that the procedures that he followed conformed with those set forth by the Forensic Services Division of the Tennessee Bureau of Investigation. He further testified that the breathalyser had been tested prior to the defendant's taking the test and that it functioned properly.

Sergeant Miller testified that the breathalyser was programmed to allow three attempts to obtain a sufficient sample. He said that the defendant blew into the breathalyser three times and that, on each occasion, the machine reported "insufficient sample." After his third attempt, the breathalyser aborted the test. Sergeant Miller testified that he could not determine whether the defendant intentionally gave an insufficient sample. Sergeant Miller then restarted the machine to conduct another test, which required another 20-minute waiting period. The defendant's second test showed a BAC of .16 percent.

Sergeant Miller testified that he did not recall the defendant's asking for a blood test or requesting to have someone come to the jail and take an independent blood test. He stated that, had the defendant asked for such a test, he would have refused pursuant to the normal procedure. He further testified that no one arrived at the jail to take an independent blood sample from the defendant.

On cross-examination, Sergeant Miller agreed that, as of August 2007, he had only been certified to operate the breathalyser for a "very short time" and had only operated it "a dozen, maybe a half a dozen" times.

The defendant, who resided in Ringgold, Georgia, testified that on the day in question, he had driven to Rhea County to participate in a karaoke contest for a radio station with his brother-in-law. He testified that, while lighting a cigarette in his vehicle, he noticed a police cruiser with its lights engaged behind him. The defendant recalled that he pulled over and that Deputy Davis approached his window and informed the defendant that he had been "hesitating." He said that Deputy Davis also asked whether he had been drinking or had any drugs in the vehicle and insisted that he had observed the defendant throw something underneath his seat. The defendant told Deputy Davis that he did not realize he was hesitating and that he had drunk two or three beers during the five-hour period he spent at the Paradise Bar. He also told Deputy Davis that he did not have any drugs.

The defendant testified that Deputy Davis asked him to exit his vehicle. The defendant said that Deputy Davis "rather abruptly" took off the defendant's glasses and then asked him to do the walk and turn test. The defendant did not recall whether Deputy Davis explicitly instructed him to touch his heel to his toe. He testified that after the test, Deputy Davis arrested him for DUI. He maintained that Deputy Davis did not administer a horizontal gaze nystagmus test or a one-leg stand test. The defendant testified that, meanwhile, another officer questioned his wife, who was riding in the vehicle with him, about drugs.

The defendant testified that Deputy Davis handcuffed him and placed him in the back of the patrol car. He stated that Deputy Davis then returned his glasses and said, "I'm going to give you one more chance, we're going to search your car, and if there are any drugs in that car, you're going to be in much bigger trouble than you are right now . . . ." He testified that the law enforcement officers searched his vehicle. The defendant was then transported to jail.

The defendant testified that Sergeant Miller provided him with the implied consent form but did not read it to him. The defendant stated that he initially refused to submit to the breathalyser test because, from his understanding, "you never take a breathaly[s]er that a blood test was much more reliable." He said, "I wanted to have a blood test to make sure that I wouldn't get into something like this with the breathaly[s]er." The defendant testified that he "[v]ery explicitly" told Sergeant Miller that he wanted a blood test "[n]umerous times" but that Sergeant Miller stated that the defendant was "not going to get a blood test."

The defendant further testified that Sergeant Miller threatened to arrest his wife for public drunkenness if he did not submit to the breathalyser. He testified that, after "several back and forths" he consented to the breathalyser. He stated that, during the 20-minute waiting period, Sergeant Miller did not watch him as he had testified but instead performed other tasks about the station. The defendant testified that, the first two times he blew into the breathalyser "zeros came up" and that Sergeant Miller declared, "[T]here's something wrong with this machine." The defendant stated that Sergeant Miller then moved him to another part of the room where he could not see the machine. Sergeant Miller returned later and asked him to attempt the breathalyser again.

-3-

He also stated that Sergeant Miller denied his requests for a blood test after he took the breathalyser test. The defendant said, "I asked afterwards and they said there's no need, we've got what we want, and you're going to jail."

On cross-examination, the defendant admitted that he did not arrange for a doctor or nurse to take a blood sample; however, he said, "I asked them to allow me to have a blood test, expecting that they would explain what . . . was required to do that." He agreed that neither he nor his wife "t[ook] any steps to have someone come down and draw [his] blood." He further admitted that he did not ask for a telephone call. The defendant maintained that he had the financial ability to pay for an independent blood test.

After allowing the defendant and the State to further brief the issue of whether the law enforcement officers deprived the defendant of his statutory and constitutional rights, the court filed a memorandum opinion and order dismissing the case on January 22, 2009. The court found that the defendant was stopped under suspicion of DUI and that he was arrested after he failed "certain field sobriety tasks." The trial court found,

> It is uncontradicted that the [d]efendant stated he did not trust the breathalyser test and that he wanted to have a blood test to verify the results of the breathalyser. The [d]efendant testified that his request was ignored and that he did not know what procedures were necessary in order for him to give the requested blood sample, but that he was financially capable of paying the costs and of arranging for someone to come to the jail and take his blood had those requirements been requested.

The trial court's order explained that the defendant's ignorance of the requirements to individually pay for and arrange transportation for an independent blood test did not affect his right to possibly mitigating evidence. The court reasoned that the "actions / inactions of Officer Miller in ignoring the [d]efendant's request for an independent test was tantamount to suppression of evidence by the State which was possibly favorable to the [d]efendant" and that such action frustrated the reasonable efforts of the defendant to obtain exculpatory evidence. The court concluded that the defendant was denied "both his statutory rights and his due process rights" and that "the only proper remedy is dismissal of the case."

The State appeals, arguing that the trial court erred in dismissing the charges against the defendant "when [the defendant] failed to show that the police hindered his efforts to obtain an independent blood alcohol test." The State posits that law enforcement officers could not have hindered the defendant's efforts to obtain independent testing because "the defendant failed to show that he took any measures to obtain an independent test." The State argues that the police have no affirmative duty to assist a defendant in obtaining evidence for his defense. Lastly, the State argues that the court erred in determining that Sergeant Miller's actions violated Code section 55-10-410(e) because this section is inapplicable to the present case.

The defendant responds that the trial court properly dismissed the charges "[b]ased upon the deliberate or intentional misconduct by Sergeant Miller in failing to give the defendant a reasonable opportunity to obtain his own evidence, available only for a short period of time." Also, the defendant maintains that Code section 55-10-410(e) applies to this case and further supports the dismissal of the charges.

Lastly, the defendant alleges that the State's appeal is frivolous and requests that the State pay his costs and expenses pursuant to Code section 27-1-112.

*I. Right to Independent BAC Testing*

The trial court determined that Sergeant Miller's denial of the defendant's request for a blood test violated the defendant's statutory and constitutional rights. We note that a trial court's factual findings are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *see State v. Mitchell*, 137 S.W.3d 630, 637 (Tenn. Crim. App. 2003). Questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge. *Odom*, 928 S.W.2d at 23. The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). With these standards in mind, we will evaluate the defendant's statutory and constitutional rights in turn.

Tennessee Code Annotated section 55-10-410(e) provides that a person tested for BAC "shall be entitled to have an additional sample of blood or urine procured and the resulting test performed by any medical laboratory of that person's own choosing and at that person's own expense." T.C.A. § 55-10-410(e) (2004). The State argues that, because "the State did not obtain a blood or urine sample from the defendant," the statute does not apply to the present case. The defendant disagrees and argues that the court correctly determined that Sergeant Miller denied him of his statutory right.

The State in its brief quotes *State v. Gilbert*, 751 S.W.2d 454, 460 (Tenn. Crim. App. 1988), to argue that Code section 55-10-410(e)'s provision for independent BAC testing "'presupposes that a sample or specimen is in existence at the time of the request; and the sample or specimen is of sufficient size or quantity that it can be made available to the accused or his expert.'" Upon our review of *Gilbert*, we find the State's argument misplaced. The quoted material from *Gilbert* applies to discovery rules regarding the independent testing of a pre-existing sample. *Id.* at 460; *see* Tenn. R. Crim. P. 16(a)(1)(G). The court did not address Code section 55-10-410(e) until later in its opinion. *Id.* at 461. The *Gilbert* court simply stated that Gilbert's reliance on Code section 55-10-401(e) was misplaced because "[t]he record [was] void of any evidence that the defendant requested an *additional* specimen of blood." *Id.* (emphasis added).

Further, we agree with the defendant that this court has determined that Code section 55-10-410(e) provides a right to an independent blood or urine sample to challenge the result of a breath test. In *State v. Johnson*, this court determined that "[t]he defendant's greatest challenge to the accuracy of the breath test is the independent blood test to which each accused has a statutory right." *State v. Johnson*, 717 S.W.2d 298, 305 (Tenn. Crim. App. 1986) (citing T.C.A. § 55-10-

410(e)).  This court has held that, when a defendant submits to a breath test as requested by law enforcement officers, he is then entitled to independent testing pursuant to Code section 55-10-410(e).  *State v. Choate*, 667 S.W.2d 111, 112 (Tenn. Crim. App. 1983) ("If [the defendant] had taken the [breath] test offered by the police he would then have had a statutory right to further tests pursuant to [Code section] 55-10-410(e).").  Thus, we hold that in the present case, when the defendant completed a breath test, he had a right pursuant to Code section 55-10-410(e) to an additional blood or urine sample for his independent analysis.

The State also argues that "[t]he trial court erroneously determined that the defendant was denied due process when officers declined to explain the procedure for obtaining an independent blood alcohol test."  Apart from Code section 55-10-410(e), a defendant's "due process rights [are] violated when the police interfere[] with the [d]efendant's attempt" to obtain independent BAC testing.  *State v. Livesay*, 941 S.W.2d 63, 66 (Tenn. Crim. App. 1996).  This is because "'[t]he denial of an opportunity to procure a blood test on a charge of intoxication prevents the accused from obtaining evidence necessary to his defense.'"  *Id.* (citation omitted).  As stated above, this right to independent BAC testing does not place upon law enforcement officers an affirmative duty "to make a blood test available to the defendant by transporting him from the place of his incarceration to a hospital for the requested test," *see Choate*, 667 S.W.2d at 113, or a duty to administer a blood test, *see Livesay*, 941 S.W.2d at 66 (citing *Brown v. Mun. Ct. of L.A. Jud. Dist.*, 150 Cal. Rptr. 216, 219 (Cal. Ct. App. 1978)).  However, "'in no event can an officer frustrate the reasonable efforts of an accused to obtain a timely sample of his blood without denying him due process of law.'"  *Id.* at 66 (quoting *Brown*, 150 Cal. Rptr. at 219).

This court, in *Livesay* stated, "We do not believe that simply suppressing the State's blood alcohol test is a sufficient safeguard of the [d]efendant's right to be able to gather and preserve evidence in his defense."  *Id.*  We then determined that, when a State's actions foreclose a fair trial by denying the defendant's access to such exculpatory evidence, the proper remedy is dismissal.  *Id.* (citing *Commonwealth v. Hampe*, 646 N.E.2d 387 (Mass. 1995); *McNutt v. Sup. Ct. of Ariz.*, 648 P.2d 122 (Ariz. 1982)).

Having determined that both Code section 55-10-410(e) and principles of due process are applicable in this case, we must now determine whether Sergeant Miller violated either the defendant's statutory or constitutional rights.  We acknowledge that this court has determined that a defendant, pursuant to the statute, does not have a right "to be advised of his privilege of obtaining a sample of his blood to be tested independently" by his arresting officers.  *State v. McKinney*, 605 S.W.2d 842, 846 (Tenn. Crim. App. 1980); *see also State v. Gray*, No. M2007-02360-CCA-R3-CD (Tenn. Crim. App., Nashville, June 26, 2008) (citing *Choate*, 667 S.W.2d at 113).

The trial court in the present case considered the defendant's asking for a blood test to be a "reasonable effort" that was "frustrated" by the inaction of Sergeant Miller and that "ignoring the [d]efendant's request for an independent test was tantamount to suppression of evidence by the State which was possibly favorable to the [d]efendant."  In light of *Livesay*, the trial court determined that dismissal of the case was the appropriate remedy.

The State first argues that the defendant failed to request an independent blood BAC test and that, therefore, no due process violation occurred; however, as we have already stated, the trial court's factual findings to the contrary are conclusive on appeal. *Binette*, 33 S.W.3d at 217; *Odom*, 928 S.W.2d at 23. The State next argues that, "even if such a request was made, the defendant failed to show that the police hampered or obstructed any efforts on his part to obtain an independent blood test." The State suggests that, in order to qualify as an "attempt" to obtain an independent BAC test, a defendant must telephone for a person to arrive at the jail to take the blood sample, arrange for that person to arrive at the jail, and/or affirmatively state his desire to pay for the test. The State maintains, because the defendant only asked for the additional testing and did not "t[ake] any steps towards procuring a blood test," Sergeant Miller could not have prevented or hampered the availability of additional testing.

The State cites *Livesay* in support of its position. In *Livesay*, after arresting Livesay for suspected DUI, the officer gave Livesay a choice between a breath and a blood test. *Livesay*, 941 S.W.2d at 64. Livesay chose a blood test and was transported to a hospital where two tubes of blood were drawn from Livesay. *Id.* Upon arriving at the jail, Livesay was permitted a telephone call, and he called his physician and requested he come to the jail "to obtain an additional blood sample for analysis." *Id.* An officer at the jail overheard the conversation and told Livesay that his doctor was not permitted to come to the jail. *Id.* At Livesay's request, the jailer then spoke with the doctor over the receiver to confirm that he was not permitted to come to the jail and take an additional sample. *Id.* Livesay's physician testified that, had he been permitted, he would have driven to the jail and obtained an additional blood specimen for analysis. *Id.* The trial court determined that the officer prevented the defendant from obtaining exculpatory evidence in violation of the defendant's due process rights and dismissed the case, and this court affirmed. *Id.* at 64-65.

The State also cites *State v. Choate* in support of its position; however, in *Choate* the defendant refused the breathalyser test and demanded a blood test *in lieu of* the breath test. *Choate*, 667 S.W.2d at 112-13. Because Choate refused to take the requested breathalyser test, the law enforcement officers "took no affirmative steps to assist the defendant in obtaining a blood sample." *Id.* at 112. Unlike Choate, the defendant in this case asked for an additional blood sample for independent testing after submitting to a breathalyser test.

Lastly, the State relies on this court's unpublished opinion in *State v. Jackie Lynn Gray*, No. M2007-02360-CCA-R3-CD (Tenn. Ct. App., Nashville, June 26, 2008). After being arrested for suspicion of DUI, Gray requested a blood test, to which the officer initially agreed. *Id.*, slip op. at 3. A few seconds later, however, the officer determined that he would give Gray a breath test instead. *Id.* Gray responded that he would "'probably flunk'" the breath test. *Id.* After completing the breath test, Gray asked the officer to take him to the hospital for a blood test, which the officer refused. *Id.* The trial court found that Gray "requested a blood test after submitting to the breathalyser test but made no attempt to procure the test other than to 'raise Cain' in the drunk tank." *Id.*, slip op. at 4. We did not disturb the trial court's determination. *Id.*

The State's argument suggests that a violation of the statute or of due process principles occurs only when the law enforcement officers' obstruction of a defendant's attempt to obtain independent testing reaches the extreme level described in *Livesay*. Further, the State argues

that a defendant's simply requesting an additional test cannot constitute a "reasonable effort" without further action. We disagree.

The defendant testified that, upon his mistrust of the breathalyser, he requested a separate blood test. Sergeant Miller responded that another test was not necessary and that "we've got what we want, and you're going to jail." We cannot fathom what other "reasonable effort" the defendant could have taken towards obtaining a separate blood test under these circumstances. Unlike the defendant in *Livesay*, many people accused of DUI will not know to immediately arrange for someone to arrive at the jail to obtain a separate sample. Unlike in *Gray*, where the trial court clearly discredited Gray's claim that he legitimately desired a separate test, in the present case the trial court determined that the defendant's requests were genuine inquiries into how he could obtain a separate blood test. The trial court in this case determined that it was unreasonable to expect the defendant, who was 61 years old at the time of arrest and had no prior DUI offenses, to know of the specific requirements of obtaining a separate BAC test. We also note the defendant's testimony that he was capable of arranging for a sample and paying for the testing. The issue before us is factually intensive, and we will not disturb the trial court's finding that Sergeant Miller's ignoring the defendant's legitimate request for a blood test amounted to "frustrating" a "reasonable effort" to obtain exculpatory evidence. We affirm the trial court's dismissal of the charges.

## II. Frivolous Appeal

The defendant, in his response brief, alleges that the State's appeal is frivolous, and he requests damages pursuant to Code section 27-1-122. Our statutory scheme allows for "just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of appeal." T.C.A. § 27-1-122. "An appeal is frivolous when it has no reasonable chance of success, . . . or is so utterly devoid of merit as to justify the imposition of a penalty." *Whalum v. Marshall*, 224 S.W.3d 169, 181 (Tenn. Ct. App. 2006) (internal citations and quotation marks omitted). Granting restitution for a frivolous appeal rests solely in the discretion of this court. *See id.* at 180-81.

The defendant argues that the State "presents no justifiable questions" and that "it can be reasonably inferred that the appeal serves only to delay and burden the other parties." We wholly disagree. As can be gleaned from the lengthy analysis above, the State's appeal presented genuine questions of law and fact. Further, we cannot discern any benefit the State would obtain through undue delay. We hold that the State's appeal is not frivolous and deny damages pursuant to Code section 27-1-122.

## III. Conclusion

In light of the foregoing analysis, we affirm the trial court's dismissal of the case, but we deny the defendant's request for damages pursuant to Code section 27-1-122.

_____
JAMES CURWOOD WITT, JR., JUDGE

-8-